UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARK AMBROSE,<br> *Plaintiff*, | )<br>)<br>) | CASE NO. 3:20-cv-723 (KAD) |
| v. | )<br>) | |
| WILLIAM MULLIGAN, *et al.*,<br> *Defendants*. | )<br>) | AUGUST 30, 2023 |

<u>**MEMORANDUM OF DECISION**</u>
<u>**RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 76)**</u>

Kari A. Dooley, United States District Judge:

In this civil rights action, Plaintiff Mark Ambrose ("Ambrose"), a sentenced inmate at McDougall-Walker Correctional Institution, alleges that Defendants, Department of Correction Utilization Review Committee ("URC") members Drs. Syed J. Naqvi, Monica Farinella, Ricardo Ruiz, and Cary Freston were deliberately indifferent to his medical needs in violation of the Eighth Amendment to the United States Constitution when they delayed surgery on his hand, resulting in permanent injury. Pending before the Court is Defendants' motion for summary judgment wherein they argue that they are entitled to judgment as a matter of law because Plaintiff cannot establish that Defendants were deliberately indifferent to his medical needs in violation of the Eighth Amendment. (ECF No. 76) Plaintiff opposes the motion. (ECF No. 100) For the reasons that follow, Defendants' motion for summary judgment is GRANTED.

**Standard of Review**

The standard under which courts review motions for summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing

law," while a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Significantly, the inquiry being conducted by the court when reviewing a motion for summary judgment focuses on "whether there is the need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250. As a result, the moving party satisfies his burden under Rule 56 "by showing . . . that there is an absence of evidence to support the nonmoving party's case" at trial. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks omitted). Once the movant meets his burden, the nonmoving party "must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "[T]he party opposing summary judgment may not merely rest on the allegations or denials of his pleading" to establish the existence of a disputed fact. *Wright*, 554 F.3d at 266; *accord Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted; internal quotation marks omitted). Nor will wholly implausible claims or bald assertions that are unsupported by evidence. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). "In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002).

**Facts and Procedural History**

The following facts are drawn from the parties' Local Rule 56(a)1 and (a)2 Statements of Facts ("LRS") and from the exhibits in the record. The facts set forth in the Defendants' LRS (ECF No. 76-2) are largely admitted by the Plaintiff (ECF No. 100-7) unless otherwise indicated.[1] On June 26, 2017, Ambrose fell and injured the little finger on his right hand. Ambrose went to the medical facility shortly thereafter and was seen by a nurse. The nurse contacted the on-call doctor,

---

[1] "A party opposing a motion for summary judgment shall file and serve with the opposition papers a document entitled 'Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment,' which shall include a reproduction of each numbered paragraph in the moving party's Local Rule 56(a)1 Statement followed by a response to each paragraph admitting or denying the fact and/or objecting to the fact as permitted by Federal Rule of Civil Procedure 56(c). . . . All admissions and denials shall be binding solely for purposes of the motion unless otherwise specified. All denials must meet the requirements of Local Rule 56(a)3. . . ." D. Conn. L. Civ. R. 56(a)2(i). Local Rule 56(a)3 requires that a denial of a movant's material fact be followed by a specific citation to evidence in the record, supporting the denial. D. Conn. L. Civ. R. 56(a)3. "Failure to provide specific citations to evidence in the record as required by . . . Local Rule [56(a)3] may result in the Court deeming admitted certain facts that are supported by the evidence." *Id.*; *see also Shetucket Plumbing Supply Inc. v. S.C.S. Agency, Inc.*, 570 F. Supp. 2d 282, 283 n.1 (D. Conn. 2008) (finding factual assertions in Local Rule 56(a)1 Statement to be "deemed admitted because they have not been squarely denied with specific citation to evidence in the record as Local Rule 56(a)(3) requires"); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion."). Further, Local Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." *S.E.C. v. Glob. Telecom Servs., L.L.C.*, 325 F. Supp. 2d 94, 109 (D. Conn. 2004).

Plaintiff's 56(a)2 Statement of Facts does not fully comply with Local Rule 56(a). First, Plaintiff purports to generally object to Defendants' LRS and second, rather than admitting or denying the statements, asserts that a fact is either "disputed" or "undisputed." Plaintiff also cites to evidence that would require speculation in order to support the purported denial, and also, with respect to some disputed facts, relies on legal arguments to create disputes of fact. Therefore, unless otherwise noted, the facts set forth above are either expressly undisputed or deemed admitted.

Dr. Naqvi, who appears from the medical record to have ordered an x-ray. The initial x-ray was done on June 28, 2017.

Each Defendant is a current or former employee of DOC and/or Correctional Managed Health Care ("CMHC"). They served on CMHC's URC at the time of Plaintiff's injury and thereafter. The URC is a panel of physicians that reviews requests for health care referral services submitted to the URC by facility medical providers. Of the URC Defendants, only Dr. Naqvi personally provided medical care to Plaintiff (on July 9, 2017, and August 3, 2017).

On July 9, 2017, Dr. Naqvi first examined Ambrose.[2] Ambrose presented with pain in his finger and joint, which was swollen and had a decreased range of motion. Dr. Naqvi ordered a second x-ray and prescribed Motrin to manage the pain. The second x-ray on July 18, 2017 showed a tendon injury/dislocation. On August 3, 2017, Dr. Naqvi examined Ambrose again. Dr. Naqvi noted that Ambrose still presented with joint swelling and a decreased range of motion, and he recommended that Ambrose be sent to the emergency room.[3] Dr. Naqvi did not see Ambrose for treatment again.

---

[2] Plaintiff also avers that Dr. Naqvi indicated at that time that he would submit a request that Plaintiff be sent to UConn to be seen but did not do so. *See* Pl. LRS at 2 ¶ 14; Aff. of Mark Ambrose, ECF No. 100-7 at 7. This allegation speaks to the adequacy of Dr. Naqvi's treatment, and does not implicate him in his role as a member of the URC. Based upon the allegations in Plaintiff's Complaint, the Court found that Plaintiff had not adequately alleged that Dr. Naqvi was deliberately indifferent to Plaintiff's serious medical needs. The only claim remaining in the case at that point was whether, as alleged, the URC members were deliberately indifferent to his medical needs when they delayed approval of his surgery until it was too late to fix his hand. Notwithstanding, Plaintiff's opposition appears to attempt to make a case against Dr. Naqvi arising out of his treatment of the Plaintiff. But this claim was dismissed and not thereafter reasserted. Accordingly, to the extent these allegations are supported in the record, and to the extent they are probative of Dr. Naqvi's knowledge at the time he took action (or failed to take action) as a member of the URC, they will be considered for this purpose. But whether Dr. Naqvi's treatment of the Plaintiff was adequate is irrelevant to the remaining issue in this case.

[3] Plaintiff also alleges that URC members Drs. Naqvi and Farinella denied him emergency care until August 3, 2017. Again, because these are allegations against Drs. Naqvi and Farinella in their capacity as treatment providers and not allegations against them in their roles as members of the URC, these allegations are irrelevant. *See supra* n.2. To the extent this evidence is probative of Defendants' knowledge at the time they carried out their URC responsibilities, it will be considered for that purpose.

4

On October 20, 2017, Dr. Pillai submitted a URC request on behalf of Ambrose requesting that Ambrose receive orthopedic follow up "for possible surgical intervention if indicated." Def. LRS at 7 ¶ 31. The URC approved this request on November 6, 2017, and Ambrose was scheduled to see an orthopedist on December 22, 2017. The URC had no further involvement in Ambrose's treatment; received no additional requests for referrals; and had no role in the follow up care it had approved regarding his receipt of orthopedic consultation and treatment.[4] Indeed, the URC never received any request for Ambrose to receive surgery on his hand. Ultimately, Ambrose was not timely scheduled for surgery and his injury became permanent. *See* Def. LRS at 8 ¶ 35; Pl. LRS at 4 ¶ 35.[5]

**Discussion**

Defendants move for summary judgment on two grounds. First, that each defendant is entitled to judgment as to Plaintiff's deliberate indifference claim because Plaintiff was not deprived of adequate medical care by these Defendants and therefore there is no genuine issue of material fact as to whether they were deliberately indifferent to his medical needs. In the alternative, Defendants argue that they are entitled to qualified immunity. The Court agrees with the former argument and does not therefore reach the latter.

The Eighth Amendment prohibits deliberate indifference to an inmate's serious medical need or medical condition by medical staff members as well as correctional staff members. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed").

---

[4] Specifically, the URC has no input on when an approved specialist appointment is scheduled, nor does it have input or control over whether or not a specialist decides to perform surgery.
[5] Plaintiff's expert opines that the injury would have needed surgical intervention within 4 to 6 weeks of the injury.

5

An inmate must meet two elements to state a claim that a custody official or medical provider was deliberately indifferent to his medical needs. The first requires the inmate to assert facts to demonstrate that his medical need or condition is objectively serious. *Hill v. Curcione*, 657 F.3d 116, 122–23 (2d Cir. 2011) (a serious medical need contemplates "a condition of urgency" such as "one that may produce death, degeneration, or extreme pain") (internal quotation marks and citation omitted).

In determining the seriousness of a medical condition, the Court considers whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citations omitted). If a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," rather than a denial of any treatment for his or her condition, "it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (quoting *Chance*, 143 F.3d at 702).

Plaintiff must also establish that Defendants were deliberately indifferent to this serious medical condition or need. To meet his burden, Plaintiff must allege that Defendants were actually aware that his or her actions or inactions would cause a substantial risk of serious harm. *See Hill*, 657 F.3d at 122 ("[T]he official must 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'") (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Mere negligent or inadvertent conduct, however,

6

does not constitute deliberate indifference. *See Estelle*, 429 U.S. at 105-06 (deliberate indifference requires a greater showing than simply "an inadvertent failure to provide adequate medical care" or "negligen[ce] in diagnosing or treating a medical condition").

Courts within the Second Circuit have found that treatment delays can satisfy these requirements where there was a needlessly prolonged delay, or where officials deliberately delayed the treatment as a form of punishment or ignored a life-threatening and fast-degenerating condition. *See Brockett v. Lupis*, No. 3:21-cv-355 (KAD), 2022 WL 1658835, at *8 (D. Conn. May 25, 2022); *Feliciano v. Anderson*, No. 15-cv-4106 (LTS) (JLC), 2017 WL 1189747, at *11 (S.D.N.Y. Mar. 30, 2017) ("Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, [the Second Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years.") (quoting *Demata v. N.Y. State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999)). A "delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Thomas v. Nassau Cnty. Corr. Ctr.*, 288 F. Supp. 2d 333, 339 (E.D.N.Y. 2003) (quoting *Chance*, 143 F.3d at 703).

As previously observed, there is only one issue remaining in this case: whether "the defendants were deliberately indifferent to Ambrose's serious medical needs *by delaying approval for corrective surgery* on his finger until the injury became permanent and could no longer be corrected." Mem. of Decision on Defs.' Mot. for Summ. J., ECF No. 46 at 4 (emphasis added). Plaintiff has adduced no evidence that Defendants delayed his request for surgery until his injury became permanent. It is undisputed that the delay in Plaintiff seeing an orthopedic specialist was

7

not attributable to the URC. Indeed, the undisputed evidence establishes that the URC approved a request from Dr. Pillai for Plaintiff to see a specialist, Def. LRS at 7–8 ¶ 31–32, that the URC had no control over when that appointment would be scheduled, Def. LRS at 8 ¶ 33, that the URC had no information as to whether surgery was recommended, Def. LRS at 8 ¶ 36, and, perhaps most significantly, that there was *no request to the URC that Plaintiff receive surgery*. Def. LRS at 3 ¶ 34. Therefore, no reasonable factfinder could conclude that the URC, or these Defendants, were deliberately indifferent to Plaintiff's medical needs. *See Camera v. Freston*, No. 3:18-cv-1595 (SALM), 2022 WL 903450, at *17 (D. Conn. Mar. 28, 2022) (no reasonable jury could conclude that doctor provided plaintiff with constitutionally inadequate care to meet objective prong of the deliberate indifference test where upon seeing doctor, plaintiff received an x-ray, and when the x-ray indicated a need for additional imaging, such imaging was likewise received).

Notwithstanding these undisputed facts, Plaintiff argues that Dr. Naqvi's knowledge from his medical treatment of Plaintiff on July 9, 2017, and August 3, 2017, is imputed to the rest of the URC and accordingly, Defendants should have independently escalated Plaintiff's treatment/diagnosis or otherwise taken additional steps to have Plaintiff immediately seen by a specialist or scheduled for surgery. Plaintiff cites no authority for this extraordinary proposition, but more to the point, there is no record evidence that Dr. Naqvi knew that Plaintiff needed surgery, let alone that a delay in surgery would create a substantial risk of further harm to the Plaintiff.[6] Dr.

---

[6] As noted in the Court's initial review order, *see* ECF No. 11, even if claims against Dr. Naqvi arising out of his initial treatment of the Plaintiff were permitted to proceed, Dr. Naqvi's treatment would, at most, amount to negligence, which is not cognizable under § 1983. *See Stevens v. Goord*, 535 F. Supp. 2d 373, 384 (S.D.N.Y. 2008) ("Mere disagreement over choice of treatment, or even a claim that negligence or medical malpractice has occurred, does not create a constitutional claim."); *Harrison v. Barkley*, 219 F.3d 132, 139 (2d Cir. 2000) ("[T]he mere malpractice of medicine in prison does not amount to an Eighth Amendment violation."). This includes "a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial[.]" *Id.* Plaintiff's current, though not plead, claim against Dr. Naqvi appears to turn on Dr. Naqvi's failure to recognize the need for a specialist in the immediate aftermath of the injury. However, Plaintiff's own expert opines that the Plaintiff's injury was extremely rare and would have been very difficult to diagnose by anyone other than a hand surgeon. He opines that even an orthopedist, to whom

Naqvi saw Plaintiff on two occasions in the aftermath of his injury. He prescribed a splint, an x-ray, and pain medication. On August 3, 2017, he recommended that Plaintiff be sent to the emergency room after his examination and review of the second x-ray. Thereafter, Plaintiff was treated by Dr. Pillai. Thus, even if Dr. Naqvi's knowledge from his early treatment of Plaintiff is imputed to the URC, there is no basis upon which that imputed knowledge creates a genuine issue of material fact as to whether Defendants delayed Plaintiff's surgery in their capacity as members of the URC. Indeed, Plaintiff fails to present any relevant or admissible evidence that Dr. Naqvi or the other Defendants were actually aware that Plaintiff needed surgery. To the contrary, the record is clear that the one request the URC received, adjudicated, *and approved* sought only a follow-up for Plaintiff with a specialist to determine *if* surgery was necessary. Def. LRS at 7 ¶ 31.

There is therefore no genuine dispute of material fact that Defendants were not deliberately indifferent to Plaintiff's medical needs by delaying or not approving his surgery. These Defendants, as members of the URC, never received any such request. It is therefore axiomatic that they were not aware of and recklessly or consciously disregarded "a substantial risk of serious harm" by their actions or inactions. *Hill*, 657 F.3d at 122, *see also Salahuddin*, 467 F.3d at 280 ("[R]ecklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.") (citations omitted).

**Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. (ECF No. 76) The Clerk of the Court is directed to enter judgment in favor of Defendants and to close this matter.

---

Plaintiff was eventually referred, would not likely make the proper diagnosis. And true to this assessment, Plaintiff's expert observes that even after Plaintiff was seen for an orthopedic consultation at UConn, he remained incorrectly diagnosed as having Boutonniere deformity. This raises the question of whether Dr. Naqvi, who is board certified in family medicine, was even negligent in his efforts to treat Plaintiff's hand in the weeks following the injury.

**SO ORDERED** at Bridgeport, Connecticut, this 30th day of August 2023.

                                         */s/ Kari A. Dooley*
                                         KARI A. DOOLEY
                                         UNITED STATES DISTRICT JUDGE